**jUNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>BINH THANH LE,<br><br>Defendant | No. 19-Cr-10199-RWZ |

## EMERGENCY MOTION FOR STAY AND REVIEW OF RELEASE ORDER

The United States of America, by and through undersigned counsel, respectfully moves this Court pursuant to 18 U.S.C. § 3145(a)(1) for a review of the temporary release order entered by the Honorable Judith G. Dein, ECF Dkt. 99, and a stay of that order pending such review.  In the Order (attached as Exhibit 1), Magistrate Judge Dein granted a motion filed by Binh Thanh Le ("LE") requesting temporary release due to the potential risk of contracting COVID-19 while detained at the Donald W. Wyatt Detention Facility ("Wyatt").  Magistrate Judge Dein's proposed release order contemplates that the defendant will be under home incarceration with location monitoring at his parents' home—the very residence where LE lived while leading the drug trafficking conspiracy and where LE attempted to have a kilogram of cocaine delivered while operating as *EastSideHigh*.[1]

LE is a healthy, 23-year old defendant, with no underlying medical conditions.  The existence of the COVID-19 pandemic does not alter the careful weighing of evidence previously engaged in by the Court, nor does it change the Court's prior dangerousness and flight risk

---

[1] Magistrate Judge Dein advised the parties that she would stay her release order, but only if the Government filed this motion for judicial review by 3:30 p.m. on May 6, 2020.

determinations.  LE has made no showing of "his particular vulnerability to the virus" that would support his release.  *See, e.g., United States v. Matthew Palacios,* No. 19-Cr-10459-RWZ, ECF Dkt. 712, at 2 (D. Mass. Apr. 13, 2020); *see also United States v. Pridgen,* No. 19-Cr-10375-RGS (D. Mass. Apr. 29, 2020) (reversing release order where defendant failed to present evidence that his claimed medical circumstances—obesity and hypertension--were so exceptional as to render his susceptibility to medical complications arising from the COVID-19 virus to be "of a magnitude appreciably greater than the many persons in the general population who suffer from hypertension") (attached as Exhibit 2).

This Court previously found that there were no conditions of release for LE that would reasonably insure the safety of the community or LE's appearance.  ECF Dkt. 63, at 2-3.  The Government appreciates the gravity of the COVID-19 pandemic and acknowledges that it presents a serious national and state public health emergency.  However, even in the midst of this pandemic, the factors set forth in 18 U.S.C. § 3142 still guide the Court in determining, on a case-by-case basis, whether pretrial release is appropriate.

## I.       PROCEDURAL BACKGROUND

LE and two others (Allante Pires and Steven McCall) are currently charged in a one-count indictment of conspiring to manufacture, distribute, and possess with intent to distribute controlled substances, including MDMA (ecstasy), Ketamine, and Alprazolam (Xanax), in violation of 21 U.S.C. § 846.

### A.       May 16, 2019:  The Original Detention Order by Magistrate Judge Dein

LE was originally charged and arrested by way of a criminal complaint.  Magistrate Judge Dein conducted LE's original detention hearing on May 15, 2019.  As detailed by the Government in its prior submission to this Court when LE first challenged his detention, *see* ECF

Dkt. 60, the evidence at the detention hearing established that LE, while living at home with his

parents, led a complex, sophisticated, international conspiracy to manufacture and distribute

controlled substances via the internet.  LE and his coconspirators (1) received wholesale

quantities and/or raw materials of controlled substances at various locations in southern

Massachusetts; (2) processed and manufactured those controlled substances at the Stoughton

Location (1749 Central Street, Suite 3, Stoughton, Massachusetts); (3) received orders for those

drugs (including, but not limited to, MDMA, Ketamine, and Xanax) via the internet using the

vendor name *EastSideHigh*; (4) filled the orders and distributed the drugs via the United States

Postal Service ("USPS").

During the detention hearing, the Government introduced evidence establishing that

agents seized more than 20 kilograms of suspected MDMA, at least 7 kilograms of suspected

Ketamine, and thousands of Xanax pills.  Agents also seized a kilogram of cocaine from a parcel

in the mail that was addressed to LE and was en route for delivery to LE's parents' residence.

(At the time, LE's *EastSideHigh* Dark Web vendor site was advertising cocaine for sale.)  As

evidenced by the sheer quantity of drugs and other evidence seized from LE's manufacturing and

distribution facility,[2] it was apparent to investigators that LE distributed significant additional

quantities of drugs.

The evidence at the detention hearing further established that the drugs seized by agents

had been sent from various domestic and international locations, and were addressed to delivery

_____

[2] Among other things, agents observed and/or seized: a pill press; large quantities of
Ketamine and MDMA; packaging materials; more than $100,000 in U.S. currency; cardboard
boxes bearing international return addresses; digital scales; and drug packaging equipment
(including heat-sealing machines and a vacuum machine).  Agents also seized a desktop
computer that was opened to the *EastSideHigh* vendor page on the Dark Net Market ("DNM")
*Wallstreet Market.*

addresses associated with LE and his coconspirators (in addition to LE's parent's residence).  To

hide their criminal conduct, LE used commercial mailboxes opened in the names of other

individuals, operated a drug trafficking business via the Dark Web to create a layer of

anonymity, and used crypto-currency when selling illicit drugs.

The Government further introduced evidence at the hearing that agents had observed LE

mailing envelopes believed to contain controlled substances, and that agents had regularly

observed LE entering and exiting the manufacturing/distribution facility.  Agents also recovered

incriminating trash discarded by LE, including: numerous Priority Mail and Priority Mail

Express labels; empty cardboard boxes and envelopes from Canada and Switzerland addressed to

the commercial mail receiving agency ("CMRA") private mailboxes used by the Defendants to

receive shipments of controlled substances; and a live round of ammunition.

Additionally, the evidence established LE's crucial role in leading the operations of the

drug trafficking enterprise.  Among other things, LE was responsible for renting private

mailboxes at several CMRAs, where LE and his coconspirators received shipments of controlled

substances, and LE signed the lease and was responsible for paying monthly rent for the

Stoughton Location.  In communications with an undercover agent, LE informed the agent that

he had two individuals working for him who performed a range of functions, including

manufacturing and shipping.

The Government's evidence further established that the conspiracy had been

tremendously profitable for LE and that LE had access to considerable Bitcoin, an untraceable

cryptocurrency.  Agents seized more than $100,000 in cash from a safe at the Stoughton

Location.  During the investigation, agents learned that LE purchased a 2014 black Mercedes

S550, and that in February 2019, LE purchased a 2018 BMW M3.  Investigators also learned that

LE was adept at converting the untraceable proceeds from his Dark Web drug trafficking from Bitcoin to cash.  At the time of his arrest, LE had just used his smartphone to access a Bitcoin wallet on the internet and electronically transfer $200,000 worth of Bitcoin to an undercover agent's Bitcoin wallet.[3]  As an agent at the detention hearing explained, it is impossible to determine whether LE had other Bitcoin wallets, thus rendering it impossible for the Government to determine whether LE has other assets at his disposal.

Finally, the evidence established that LE was born in Vietnam, still had relatives living in Vietnam, and that the United States had no extradition treaty with Vietnam were LE to flee the country.

On May 16, 2020, Magistrate Judge Dein issued an Order granting the Government's motion for detention.  ECF Dkt. 25, 26.  Despite LE's age, lack of prior criminal history, and the fact that LE did not flee while on release from state court, Magistrate Judge Dein concluded that no conditions could reasonably assure the safety of the community or LE's appearance as required.  In reaching this conclusion, Magistrate Judge Dein held that LE's "close contacts with his family" were outweighed by the facts that LE had engineered a sophisticated narcotics trafficking operation "for utmost secrecy" and the significant amount of "untraceable funds to which [he] has access."  *Id.* at 3.

**B.      September 24, 2019:  This Court Affirmed LE's Detention Order**

On August 9, 2019, LE sought this Court's review of the detention order, ECF Dkt. 56, which the Government opposed, ECF Dkt. 60.  After conducting a *de novo* review, this Court

---

[3]  Investigators also believe that LE conducted a Bitcoin exchange on February 14, 2019, when investigators observed LE exit the Stoughton Location with a money counter and drive to a Dunkin' Donuts, where a man with a backpack entered LE's vehicle.  Seized messages obtained from LE's cellular telephone confirm that this meeting was to conduct a Bitcoin exchange.

upheld the magistrate's detention order.  ECF Dkt. 63, at 1-2.  Contrasting LE with his two co-

defendants whom the Court previously ordered released on conditions, the Court found that the

"strength of the evidence against LE and his apparent role as the leader of th[e] sophisticated

conspiracy distinguish him from McCall and Pires[.]"  *Id.* at 2.  This Court emphasized the

significant evidence of LE's pivotal role as the mastermind of the conspiracy that distributed

massive quantities of drugs via the Dark Web:

> Le signed the lease for the office space where agents executed a search warrant and
> found a pill press, large quantities of drugs, shipping supplies, more than $100,000
> in cash, a computer opened to the Dark Web vendor page, and items bearing LE's
> name.  Le also rented several mailboxes, where he received wholesale quantities of
> controlled substances, and he was observed by law enforcement mailing packages
> containing drugs.  Additional pertinent evidence includes: the interception of a
> kilogram of cocaine en route to Le's personal residence, where he resided with his
> parents; Le's statement to an undercover agent that he had other individuals
> "working for him," . . . text messages from Le's phone in which he delegated tasks
> within the conspiracy . . . and law enforcement's recovery of ammunition and drug
> residue in trash discarded by Le outside the office space.

*Id.*, at 2-3.  The Court concluded that the Government had established "by clear and convincing

evidence that no conditions of release can reasonably assure the safety of the community."  *Id.* at

3.  The Court similarly found that "no conditions will assure Le's future appearance as required,"

noting (1) that LE "faces the possibility of significant prison time"; (2) that LE "was arrested

while attempting to exchange $200,000 worth of Bitcoin for U.S. currency and may have access

to additional drug proceeds if release"; (3) that the "conspiracy had an international dimension,

involving drug shipments from Switzerland and Canada"; and (4) that "LE has family ties to

Vietnam."  *Id.*

**C.**      **May 6, 2020:  Magistrate Judge Dein Ordered LE's Temporary Release**

On April 20, 2020, LE sought reconsideration of his detention order pursuant to 18

U.S.C. § 3142(i).  ECF Dkt. 83.  In that motion, two supplemental memoranda, and a reply

memoranda, ECF Dkt. 83, 84, 85, 90, LE contended that Wyatt's procedures for handling and

responding to the COVID-19 virus were inadequate and that the conditions at Wyatt were

inadequate to protect LE.  The Government opposed the motion.  ECF Dkt. 60.

At a May 6, 2020 video hearing, Magistrate Judge Dein informed the parties that she was

planning on temporarily releasing the defendant pursuant to 18 U.S.C. § 3142(i).  Magistrate

Judge Dein subsequently issued an Order explaining her decision.  ECF Dkt. 99.  In the order,

Magistrate Judge Dein reaffirmed that her original detention order was warranted.  Nevertheless,

Magistrate Judge Dein noted that the COVID-19 pandemic altered the calculus and presented a

compelling reason warranting LE's temporary release.  *Id.* at 3-4.  Magistrate Judge Dein

recognized that LE "does not have any physical conditions that put him at high risk if he

contracts the virus"; nonetheless, she expressed her view that "reduction in the prison population

in and of itself would help authorities to prevent an outbreak of the virus in the confines of the

facility."  *Id.* at 3-4.  Magistrate Judge Dein reasoned that the temporary release conditions she

was imposing would prevent the defendant from re-engaging in criminal activity, *id.,* at 4, that

travel restrictions due to the pandemic limited the risk of flight, *id.,* at 4-5, and that LE's

purported pursuit of a self-directed restorative justice program reflected an understanding that

failure to comply with conditions of release could have serious consequences, *id.* at 5.

## **LEGAL STANDARD**

Pursuant to 18 U.S.C. § 3145(a)(1), the Government is authorized to seek review of a

release order of a defendant  "with the court having original jurisdiction over the offense" and

request "revocation of the order or amendment of the conditions of release."  This Court, as the

court of "original jurisdiction," conducts *de novo* review of a contested order of release.  *United

States v. Tortora,* 922 F.2d 880, 883 n.4 (1st Cir. 1990).  On review, the district court "need not

defer to the magistrate's findings or give specific reasons for rejecting them." *United States v. Cidraz-Santiago,* 18 F. Supp.3d 124, 126 (D.P.R. 2014).

A defendant must be detained pending trial if, after a hearing, the court determines that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(e). In determining whether any conditions of release will reasonably assure the defendant's appearance and the safety of any other person and the community, the Court must consider the factors set forth in 18 U.S.C. § 3142(g), which include: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence; (2) the weight of the evidence; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger that the defendant's release would pose to any other person or the community.

Where the defendant is charged with an offense punishable under the Controlled Substances Act, 21 U.S.C. 801 *et seq.*, that carries a maximum term of imprisonment of ten years or more, a rebuttable presumption arises of both danger to the community and risk of flight. *See* 18 U.S.C. § 3142(e)(3)(A). While the defendant bears the burden of producing evidence to rebut that presumption, the ultimate burden of proof remains with the Government. *United States v. Gennaco*, 834 F. Supp.2d 38, 40 (D. Mass. 2011) (Gorton, J.).

Pursuant to 18 U.S.C. § 3142(i), a court is permitted to re-examine its prior detention decision "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." The defendant bears the burden of establishing circumstances warranting temporary release under § 3142(i). *See United States v. Washington,* 2020 WL 2112343, *5 (M.D. Pa. May 4, 2020). "A defendant is not entitled to temporary release under § 3142(i) based solely on generalized COVID-19 fears and

speculation." *United States v. Washington,* 2020 WL 2112343, *5 (M.D. Pa. May 4, 2020)

(citing *United States v. Clark,* 2020 WL 1446895, at *3 (D. Kan. Mar. 25, 2020)); *see United*

*States v. Brown,* 2020 WL 2119612, at *5 (M.D. Pa. May 4, 2020) (collecting cases).

## ARGUMENT

Magistrate Judge Dein's Order focuses on the public policy objective of reducing the

prison population in order to limit the transmission of the COVID-19 virus.  However, laudatory

that objective might be, the Order would effectively require the release of all detainees—

regardless of whether the detainee is suffering from a medical condition that significant increases

the risk of medical complication upon COVID-19 infection or the detainee is a healthy 23-year

old.  This type of general public policy objective, however, falls far short of demonstrating a

particularized risk to an individual's health that would be sufficient to constitute "another

compelling reason" under 18 U.S.C. § 3142(i)(4) permitting a defendant's pretrial release.  LE is

23 years old with no underlying health conditions.  As another court has recently observed, "if

the mere existence of the COVID-19 pandemic alone provides 'another compelling reason' for

temporary release, then the court would be hard-pressed to envision a defendant who would not

presently be entitled to relief under this provision." *United States v. Sanford,* 2020 WL 2114402,

at *4 (W.D. Wash. May 4, 2020).

The risk of contracting COVID-19 exists regardless of whether LE is detained or

released.  Given LE's age and overall good health, LE is at an exceedingly low risk of either

hospitalization or death in the unfortunate event that he were to contract COVID-19.  Wyatt has

taken extensive precautionary measures to limit the transmission of the virus within the facility.

The COVID-19 pandemic—while undoubtedly serious and necessitating strong precautionary

steps, particularly in detention facilities like Wyatt—has not changed the facts and circumstances

particular to LE, which, as the Court previously found, demonstrate that LE presents a danger to the community and a flight risk.  Accordingly, his release is not warranted.

### A.     LE's Risk of Contracting COVID-19 Is Not A Compelling Reason Justifying Release

LE argued before Magistrate Judge Dein that the COVID-19 pandemic presents a compelling reason warranting his temporary release, contending that his continued detention in the midst of the pandemic "presents the risk of serious illness or death, which necessitates [his] temporary release."  ECF Dkt. 83, at 1.  LE conceded that he "does not have any underlying medical conditions" that would place him at a higher risk of developing serious complications if he were to contract COVID-19, or which otherwise make him any more vulnerable than any other detainees.  *Id.* at 11.  LE argued, however, that because some Wyatt detainees have recently tested positive for COVID-19, the virus presents "changing and increasingly dangerous circumstances" that must be considered when conducting the detention analysis under § 3142(g).  ECF Dkt. 84, at 2.  In her Order, Magistrate Judge Dein did not identify any specific risk to LE's personally; rather, she premised her ruling on the general need to reduce the prison population in order to prevent further COVID-19 outbreaks.  ECF Dkt. 99, at 3-5.

Several courts in this District, including this Court, have rejected claims similar to LE's involving defendants who had no preexisting health conditions rendering them more susceptible to developing severe complications were they to contract the virus.  *See United States v. Matthew Palacios,* No. 19-Cr-10459-RWZ, ECF Dkt. 712, at 2 (D. Mass. Apr. 13, 2020).  As these courts have recognized, a generalized risk of contracting COVID-19 is not a compelling reason for release under Section 3142(i) where the defendant has not identified any unique health vulnerabilities to COVID-19.  *E.g., United States v. Guerrero-Lara*, No. 19-cr-10476-RGS (D. Mass. April 2, 2020) (denying motion for reconsideration of detention order based on COVID-19

where the defendant was "22 years old and he [did] not assert that he has any medical conditions that would make him more vulnerable than other detainees to COVID-19."); *United States v. Abinader*, No. 19-cr-10377-MLW (D. Mass. April 1, 2020) (denying motion for release based on COVID-19 where the defendant did "not raise[] any particularized concerns regarding his health condition or situation, but only systemic concerns that apply to all detained individuals," and the facts demonstrating his dangerousness to the community were unchanged, explaining that "[a]bsent some particularized concern regarding the effect of the pandemic on Abinader, the balance still weighs in favor of detention."); *United States v. Baez*, No. 19-cr-10422-RWZ, at *4-5 (D. Mass. April 15, 2020) (ordering detention despite the COVID-19 pandemic where the defendant presented no evidence of a medical condition, but permitting reconsideration of the order if the defendant provides evidence of a "medical condition and how his particular condition poses a risk to him from incarceration."); *United States v. Diaz*, No. 19-cr-10033-LTS (D. Mass. April 15, 2020) (denying release based on COVID-19 where the defendant "identifi[ed] no health problems"); *United States v. DeAraujo*, No. 19-cr-10210-NMG (D. Mass. April 7, 2020) (denying release based on COVID-19 where the defendant "identifie[d] no individualized facts regarding his age or health condition that make him more vulnerable than other detainees to COVID-19."). Nationwide, a large number of courts agree with this assessment. *See, e.g., Brown,* 2020 WL 2119612, at *5 (collecting cases).[4]

---

[4] The Government further notes that courts have required a substantial showing of extraordinary medical vulnerability even when confronted with claims that a given defendant's underlying health condition places him or her at greater risk of serious complications arising from a COVID-19 infection. For example, in *United States v. Michael Pridgen,* No. 19-Cr-10375-RGS (D. Mass. Apr. 29, 2020), Judge Stearns reversed a release decision by Magistrate Judge Boal involving a defendant who suffered from obesity and hypertension. Judge Stearns noted that there was "no medical evidence in the record specific to Pridgen that is of a magnitude appreciably greater than the many persons in the general population who suffer from hypertension." Judge Stearns recognized that "in conducting … de novo review [of a detention

LE is a healthy 23-year old defendant; he suffers from no medical condition that would

render him particularly vulnerable were he to contract the COVID-19 virus.  Nevertheless,

before Magistrate Judge Dein, LE claimed that the virus posed a serious risk to his health and

that Wyatt's mitigation measures are inadequate.  In support of this argument, LE cited data

published by the Centers for Disease Control ("the CDC") showing that, between February 12,

2020 through March 16, 2020, "younger adults between ages 20 to 44 comprise 14-20% of

adults requiring hospitalization from the virus."  ECF Dkt. 83, at 5 & n.7.  This data—which was

based on only 2,500 patients from the early stages of the pandemic in the United States—is

outdated and does not illustrate the risk of the virus to individuals who, like LE, have no

underlying health conditions.  More recent and relevant data demonstrate that COVID-19 poses a

very low risk for young adults who, like LE, are otherwise healthy.  Indeed, data published by

the Massachusetts Department of Public Health on April 27, 2020, indicated that for individuals

like LE—*i.e.,* young people who have no underlying health conditions—the risk of

hospitalization or death due to COVID-19 is exceedingly low.[5]

---

decision], a judge must give careful consideration not only to the risks posed by releasing the
defendant – flight, danger to others or to the community, and likelihood of further criminal acts –
but also, during this pandemic, to the risk that the defendant might die or become seriously ill if
kept in custody." *Id.* at 5 (quoting *Christie v. Commonwealth,* 484 Mass. 397, 398 (2020)).  But,
where the Government has established that the defendant was a danger to the community, Judge
Stearns concluded that the defendant must show that his medical circumstances are sufficiently
"exceptional as to tilt the balance in favor of his temporary release." *Id.*  Because the defendant
had not done so, Judge Stearns reversed the temporary release order.

   [5] In particular, this data shows:

- There have been 6,807 confirmed COVID-19 cases among people age 20-
  29 in of Massachusetts (*see* Exhibit 4 at 9), but only 113 people in this age
  cohort have been hospitalized (*see id.* at 10);

- There has only been ***one*** death of a COVID-19 patient in the age range of
  20-29 in Massachusetts, and COVID-19 deaths of people under age 40 are

Accordingly, in a case like this—where the defendant is a healthy, 23-year old with no particularized health conditions that would raise the risk to him if he were to contract the virus—there simply is no compelling reason to grant temporary release under § 3142(i).

### B.      Wyatt's Precautionary Measures Are Adequate To Mitigate the Risks of COVID-19 Transmission without LE's Temporary Release

In her Order, Magistrate Judge Dein noted that the parties disagreed about the extent and efficacy of the efforts undertaken by Wyatt official to mitigate the spread of the COVID-19 virus at the facility.  ECF Dkt. 99, at 3.  Magistrate Judge Dein declined to resolve this issue.  Instead, the Order discussed the more general policy of seeking to safely reduce the prison population in order to prevent outbreaks among the detainee population.  *Id.* at 3-4.

The Government agrees that COVID-19 presents a public health emergency.  All facets of national, state, and local government have turned their focus and determination to slowing the spread of the outbreak, protecting the health and safety of the community, and addressing the medical needs of those who have contracted the virus.  That focus and attention includes authorities and staff responsible for federal and state detention facilities, including at Wyatt.  In response, authorities at Wyatt have taken extensive precautionary measures to mitigate the risk of transmission within the facility.

As of May 4, 2020, among the 564 detainees at Wyatt, a total of 142 have been tested for COVID-19, and 13 detainees have tested positive.  *See* Exhibit 3.  Of the 146 staff members who have been tested, only three have tested positive to date.  *Id.*  The administration at Wyatt has

---

low overall: there have been zero deaths among patients aged 0-19, and only seven deaths among patients aged 30-39 (*see id*. at 11); and

▪      While 98.1% of deaths (a total of 1,289 patients) from COVID-19 in Massachusetts have been among patients with underlying conditions, only 1.9% (a total of 25 patients) without underlying conditions have died from COVID-19 in Massachusetts (*see id.* at 13).

adopted an extensive set of procedures to prevent the spread of COVID-19 in its facilities, and is providing twice-weekly status reports concerning its efforts to mitigate the spread of COVID-19 within Wyatt generally, the total number of detainees, and the status of testing.  As reflected in Wyatt's most recent report dated May 4, 2020, Wyatt officials have taken extensive efforts to ensure a safe environment for inmates and reduce the risk of the introduction or spread of COVID-19 within those facilities, including by:

- reducing its population from 707 to 564 detainees as of May 4, 2020;

- directing detainees to sit only one to two people at a four-person table during non-lockdown mealtimes, and providing guidance to avoid congregating in groups;

- reassigning detainees to available cells so as to increase social distancing within the cells;

- medically screening incoming detainees for COVID-19 symptoms and isolating incoming symptomatic detainees to the extent possible;

- establishing a quarantine plan under the supervision of its medical director;

- prohibiting staff with symptoms of COVID-19 from working and requiring them to self-quarantine for 14 days;

- increased cleaning throughout the day of high-touch areas such as tables, chairs, handrails, and phones, and conducting nightly cleaning and disinfecting of showers and other common areas with a bleach solution;

- providing additional soap, cleaning materials, and sanitizers throughout the facility for use by staff and detainees;

- suspending physical visitation and giving detainees free phone calls in lieu of visitation, and arranging audio and video conferencing services for court appearances and other visits traditionally held in-person, including attorney visits;

- limiting vendors and contractors from entering the facility and screening them for COVID-19 symptoms;

- providing guidance and instruction to detainees and staff about personal hygiene and social distancing protocols; and

- providing PPE such as gloves and masks.

Exhibit 3, at 3-11.  Additionally, Wyatt has also adopted a set of protocols to treat detainees and mitigate the risk of viral spread within the facility in the event of a positive COVID-19 case, including by:

- isolating the detainee in a medical isolation unit with negative pressure;

- providing the detainee with a mask to wear and medical evaluation;

- interviewing the detainee to evaluate their symptoms, the date of their onset, and determine their contacts with other detainees, staff, and physical areas in the facility;

- sanitizing areas that the detainee may have touched;

- interviewing other detainees who may have had contact with the detainee;

- securing and isolating the detainee's unit and limiting access to staff with appropriate PPE, and informing detainees in the affected unit of the positive case and instructing them to wear masks outside their cells and to report symptoms;

- testing detainees who present COVID-19 symptoms or who the Department of Health believes, based on contact tracing and exposure, should be tested; and

- quarantining multiple positive COVID-19 detainees in separate units that have negative pressure.

*Id.*

Wyatt has been following the robust infection-control and treatment procedures outlined in its pandemic plan in an attempt to mitigate further spread of the virus.[6]  While it has proven

---

[6] Before Magistrate Judge Dein, LE also argued that Wyatt's management of the first positive COVID-19 detainee was inadequate, claiming that Wyatt "responded with an alarming lack of caution" to the detainee's "worsening symptoms, and carelessly put numerous lives at risk."  ECF. Dkt. 85 at 1.  However, as demonstrated by the Affidavit of Wyatt Chief of Security

impossible for Wyatt to eliminate entirely the risk of the virus' introduction into, or transmission

within, the facility, it is equally true that such risks exist in the community at large as well.

Sadly, the town where LE has proposed to live (Brockton), has one of the highest COVID-19

infection rates in the South Shore of Massachusetts.[7]  LE has not, and cannot, demonstrate that

he is being detained under conditions that pose a significant risk to his health and life warranting

his release.

> **C.      *The Proposed Release Plan Would Not Reasonably Assure the Safety of the Community or His Appearance***

This Court previously held that there were no conditions of release that would reasonably

assure the safety of the community or LE's appearance.  The facts underlying that determination

remain unchanged.

LE is charged with a conspiracy that was, in many respects, an e-commerce narcotics

operation conducted via social separation.  Among other things, as this Court has previously

noted, the conspiracy involved, *inter alia*:  (1) ordering narcotics online, which were then

delivered via the mail; (2) accepting orders for narcotics online; (3) accepting payments via

Bitcoin; and (4) distributing the drugs to customers through the mails.  Although the conspiracy

---

Michael Nessinger ("the Nessinger Affidavit," which was attached as Exhibit 2 to the Government's Opposition, ECF Dkt. 87) the Allen Affidavit was inaccurate in several crucial aspects.  *See* Nessinger Affidavit, ¶¶ 7-10.

[7] As recently reported, Brockton has "the alarming distinction of being second only to Chelsea in having the state's highest rate of infections — and second only to Boston in overall cases."  *See* Vernal Coleman, *"Brockton, Randolph stand out with coronavirus infection rates among the state's highest,"* Boston Globe (April 28, 2020), available at https://www.bostonglobe.com/2020/04/28/nation/two-south-shore-communities-stand-out-with-states-highest-number-coronavirus-cases/ (last accessed on April 28, 2020).  In the past month, there have been 138 COVID-19-related deaths in Brockton and more than 1,800 Brockton residents have been treated for the virus.  *Id.*

also involved street-level drug distribution, the Dark Web operation was a significant part of the operation. LE could readily reestablish an online narcotics marketplace from his parents' residence, and nothing about the stay-at-home advisory or social distancing guidelines would prevent LE from doing so.

The proposed conditions of release seek to limit LE's access to devices that access the internet. In an era where smartphones and tablets are prolific, controlling LE's access to such devices would be difficult in the best of circumstances. Here, however, it is functionally impossible to do so under the current circumstances, where Pretrial Services officers would put their health at risk if they were required to enter LE's residence to monitor whether the prohibited devices have actually been removed and whether his parents are actually restricting LE from using their password-protected devices. Nor would it prevent a friend of LE's from entering the residence and permitting LE surreptitious access to his or her laptop, tablet, or smartphone. Given the availability of cloud computing in which one can readily download information that may have been stored on servers anywhere in the world and which permit individuals who lose their electronics to restore their data with a simple keystroke, all that LE would need to revive his drug trafficking operation is a tablet, smart phone, or computer—any one of which would afford him access to the Dark Web, cryptocurrency, and his network of former customers.

Moreover, it is not reasonable to expect that LE's parents, however well-intentioned they may be, to provide the necessary reassurance that LE would not be able to gain access to those devices. As this Court noted in ordering LE's detention: LE lived at his parents' residence throughout the time he participated in the drug trafficking conspiracy. While purportedly working at a pizza shop, LE owned and operated a 2014 Mercedes S550 and purchased and

operated a $70,000 BMW.  LE had more than $100,000 in cash at the Stoughton Location at the

time of his arrest.  While living with his parents, LE attempted to have a kilogram of cocaine

delivered to their home via the mail.  Under the circumstances, it cannot be credibly argued that

LE's parents or family members can ensure LE's compliance with the law.

Finally, the Government respectfully disagrees that current worldwide conditions have

mitigated the risk of flight by LE.  LE faces a significant term of incarceration if convicted on

the pending charge, and as this Court noted in ordering his detention, LE has family ties to

Vietnam.  Although Vietnam has currently closed its borders to lawful immigration due to the

COVID-19 pandemic, this does not, in and of itself, mitigate the risk of flight: LE could readily

flee to other locations within the United States or abroad, and the relative difficulty of doing so

during a pandemic does not eliminate that risk.  Travel limitations are changing daily as

countries vary their approaches to the COVID-19 pandemic.  Although Vietnam currently does

not permit foreigners to enter the country (at least not lawfully), that policy could change

tomorrow.  Moreover, there are a number of countries (like Vietnam) that do not have extradition

treaties with the United States.  Should LE find his way to one of these countries, he will have

successfully obtained a safe harbor preventing prosecution.

Similarly, the proposed release on the condition of a $100,000 bond secured by his

parents' home, does little to mitigate the risk of flight given both: (1) the significant sentence that

LE faces; and (2) that there are significant "untraceable funds to which [LE] has access."  ECF

Dkt. 26, at 3.  As discussed previously, LE had access to considerable assets on the day of his

arrest (more than $200,000 worth of Bitcoin and more than $100,000 in cash at the office).

Given the sheer quantities of drugs seized and the length of time that *EastSideHigh* was

operating, there is every reason to believe that, if released, LE would have access to significant

funds that could finance his flight and more than compensate his parents for the loss of their

secured bond.[8]

**CONCLUSION**

Even in the midst of the COVID-19 pandemic, the factors set forth in § 3142(g) still

guide the Court in determining, on a case-by-case basis, whether pretrial release is appropriate,

namely: whether there are conditions that can reasonably assure the safety of the community and

the defendant's appearance as required.  LE is a healthy 23-year old with no underlying medical

issues.  The COVID-19 virus simply does not provide a basis for revisiting the Court's prior

order of detention in this case.  The Government respectfully requests that this Court review the

temporary release order entered by the Honorable Judith G. Dein, and stay the order pending

such review.

        Respectfully submitted,

        ANDREW E. LELLING
        United States Attorney

By:    */s/ James E. Arnold*
       JAMES E. ARNOLD
       RACHEL E. GOLDSTEIN
       Assistant U.S. Attorneys
       United States Attorney's Office
       1 Courthouse Way, Suite 9200
       Boston MA 02210
       617-748-3603/617-748-3242

---

[8] In her Order, Magistrate Judge Dein accepted defense counsel's argument that LE "is studying principles of restorative justice, even though he is not enrolled in any program" and reasoned that LE "could use the period of release to continue his studies."  ECF Dkt. 99, at 5. From this, Magistrate Judge Dein concluded that LE "seems fully capable of understanding that not complying with conditions of release could have serious negative repercussions."  *Id.*  Other than defense counsel's representation (and despite numerous filings by the defendant), the record is devoid of any information concerning this purported "self-directed" program or the activities undertaken by the defendant in such a program.

<u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ James E. Arnold
JAMES E. ARNOLD
Assistant U.S. Attorney

Date: May 6, 2020.